IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2016

**STATE OF TENNESSEE v. CHRISTOPHER MINOR**

**Appeal from the Circuit Court for Madison County**
**No. 15-167    Roy B. Morgan, Jr., Judge**
_____

**No. W2016-00348-CCA-R3-CD  -  Filed February 16, 2017**
_____

In a bifurcated trial, a Madison County jury convicted the defendant, Christopher Minor, of two counts of first degree murder, two counts of aggravated burglary, one count of aggravated assault, one count of convicted felon in possession of a firearm, one count of employing a firearm during the commission of a dangerous felony, one count of employing a firearm during the commission of a dangerous felony having been previously been convicted of a felony, and six counts of violating Tennessee Code Annotated section 40-35-121, the criminal gang offenses enhancement statute.  The trial court imposed an effective sentence of life plus twenty years.  The defendant appeals his conviction, challenging the sufficiency of the evidence and the constitutionality of Tennessee Code Annotated section 40-35-121.  The State argues the evidence was sufficient to support the defendant's convictions, and the defendant waived his constitutional challenge by raising his argument for the first time on appeal.  We agree with the State and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. CAMILLE R. MCMULLEN, J., filed a separate opinion concurring in part and dissenting in part.

Lee R. Sparks, Jackson, Tennessee, for the appellant, Christopher Minor.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; James G. Woodall, District Attorney General; and Aaron J. Chaplin, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual and Procedural Background*

This appeal arises as a result of the murder and aggravated burglary of deceased victim Rico Swift, and the aggravated robbery and aggravated assault of female victim Julie Frye. The jury trial began on September 22, 2015. At trial, the parties presented the facts summarized below.

The afternoon of June 8, 2014, Terron Kinnie called the defendant and asked that the defendant and Freddie Booth meet at his house around 4:00 p.m. Mr. Booth and the defendant complied. All were members of a street gang known as the Black P-Stone[1] Nation. Mr. Kinnie had the rank of "general" and oversaw the gang. The defendant was a low-ranking member of the organization known as a "foot soldier."

When the defendant and Mr. Booth arrived at Mr. Kinnie's home, Rayshawn Norman, Kijuan Murphy, Terry Thompson, and Mr. Kinnie were present. Mr. Norman was also a member of the Black P-Stone Nation, but Mr. Murphy and Mr. Thompson were members of the Vice Lords, a related street gang. According to the defendant's trial testimony, Mr. Kinnie announced that Mr. Norman needed to prove himself to the gang by robbing the deceased victim. Mr. Kinnie chose the deceased victim because he had animosity towards him and considered him weak. The deceased victim also sold marijuana, and Mr. Kinnie knew he kept a large sum of cash in his apartment.

The defendant testified that the men developed a plan. Later in the evening, they would go to the deceased victim's apartment. The defendant and Mr. Booth would enter first under the guise of purchasing marijuana. While making their purchase, they would surveil the apartment and determine whether anyone else was present. The remaining men would then enter the apartment and rob the deceased victim.

Around 9:00 p.m., the men parked in the nearby driveway of a friend. The defendant drove Mr. Booth, Mr. Kinnie, and Mr. Norman in his girlfriend's white Chevrolet Malibu. A man known as "Big Ghost" drove Mr. Thompson and Mr. Murphy. The defendant and Mr. Booth then walked to the deceased victim's apartment.

While the parties presented similar evidence at trial as to the subsequent events, the accounts of the female victim and the defendant differ as to who beat and injured the

---

[1] Throughout the transcript, the defendant's gang is referred to as either "Black P-Stone Nation" or "Black Peace Stone Nation." In order to maintain consistence, we will refer to it as "Black P-Stone Nation."

victims.  The female victim testified that she and the deceased victim were in the apartment watching basketball on television when they heard a knock on the door.  The deceased victim looked out the window, gave a funny look, and opened the door.  He then let Mr. Booth and the defendant into the apartment and locked the door behind them.

Mr. Booth entered the apartment first, followed by the defendant.  The men each asked for a "blunt"[2] and gave the deceased victim $5 apiece.  After taking the money, the deceased victim turned to get the marijuana.  Once the deceased victim turned around, the defendant and Mr. Booth "jumped" him.  The men grabbed the deceased victim around the neck and beat him in the left side of his head.  The female victim testified that "[t]hey just kept busting him in his head, just everywhere."  While this was happening, she sat on the couch in shock.  Mr. Booth and the defendant eventually pushed the deceased victim onto the couch and continued to punch him in the head.  They then choked him.  The deceased victim's legs began jumping and he turned blue.

The female victim testified that she decided to do something to help her boyfriend.  She got up to walk to her bedroom and retrieve a pocketknife; however, before she got to the end of the couch, the defendant directed Mr. Booth to "[g]et that bitch, get that bitch, get that bitch."  Mr. Booth then grabbed the female victim, slammed her into the wall, and threw her onto the kitchen floor.  As she was being pushed into the kitchen, the female victim saw three other men in the apartment.  According to the female victim, somebody must have let the men into the apartment because she remembered the deceased victim locking the door.  The defendant then came into the kitchen, put a small gun between her eyes, and said, "Bitch, you got a phone?  You got a phone, bitch?"  After she did not respond, the defendant drew back the gun.  She next remembers waking up on the kitchen floor covered in cockroaches and at trial agreed she got "knocked out or something."

After waking on the kitchen floor, the female victim walked into the living room and found the deceased victim on his knees with his face down over the couch.  She saw blood everywhere.  In search of help, the female victim ran to the parking lot and found two men, Jarkius Person and Chance Mitchell.  The men entered the apartment with her and called 911.

At trial, the defendant offered a different account of his role in the events occurring June 8, 2014.  According to the defendant, after leaving their friends in the nearby driveway, he and Mr. Booth walked to the deceased victim's apartment and knocked on the door.  The deceased victim answered the door, and the defendant and Mr.

---

[2] The female victim testified that a "blunt" is a small amount of marijuana rolled into a cigarette.

Booth asked for two "dime sacks"[3] of marijuana. Mr. Booth then walked into the apartment followed by the defendant, who closed the door behind him.

Once inside the apartment, the defendant began to look around and noticed the female victim in the bedroom. The deceased victim retrieved the marijuana from his bedroom, gave it to the defendant and Mr. Booth, and the men paid. Mr. Booth and the defendant then exited the apartment and found Mr. Kinnie, Mr. Thompson, Mr. Murphy, and Mr. Norman in the stairwell. The defendant walked past, said "no," and held up two fingers, attempting to signal that there were two people in the apartment, so they should abandon the robbery. Despite his warning, Mr. Kinnie, Mr. Thompson, Mr. Murphy, and Mr. Norman went inside the deceased victim's apartment. Mr. Booth closed the door behind them, and the defendant and Mr. Booth ran to the nearby driveway where they had parked their cars. Big Ghost was waiting in his car, and the defendant advised him that there were two people in the apartment, but the men went forward with the robbery anyway. After a couple minutes, Mr. Kinnie, Mr. Thompson, Mr. Murphy, and Mr. Norman ran back to the cars. Mr. Kinnie, Mr. Murphy, and Mr. Norman got inside the car driven by the defendant. They were covered in blood, but Mr. Norman had the most blood on his body.

The men returned to Ms. Kinnie's house. According to the defendant, once at Mr. Kinnie's house, they split the money taken from the deceased victim. The defendant, Mr. Booth, and Big Ghost each received $50 for driving and scoping out the property. The other four men received $300 apiece. Mr. Kinnie, Mr. Thompson, Mr. Murphy, and Mr. Norman discussed the beating in the defendant's presence. They told the defendant that the deceased victim tried to bite Mr. Norman, so Mr. Norman put him into a headlock. Mr. Kinnie bragged to the group about hitting the deceased victim in the head. The men said the female victim "just fell out." The defendant denied hitting either victim. The defendant further denied having a gun. According to the defendant, he did not learn about the deceased victim's death until the following day.

Officers from the Jackson Police Department responded to the 911 call made following the apartment invasion and beating. Officer Ricky Stewart was one of the first officers to arrive at the crime scene, so he authored the police report. Officer Stewart encountered the female victim when he arrived and testified that he did not observe any blood, contusions, or bumps on her head. Officer Stewart noted in his report that the female victim denied medical treatment.

Officer Darrell Listenbee, another patrol officer with the Jackson Police Department, also responded to the emergency call. When he arrived, the female victim

---

[3] The defendant testified that a "dime sack" contains a small amount of marijuana.

was waiting outside of the apartment. Officer Listenbee testified that upon entering the residence, he found the deceased victim lying on the couch, unresponsive, and bleeding from his head. Along with the female victim and another officer, Officer Listenbee waited on the emergency medical responders to arrive. Officer Listenbee noted the living room and one other room were in disarray. The female victim told him that she had been hit in the head by one of the intruders and knocked unconscious.

Investigator Daniel Long was the first investigator to arrive. When he got to the crime scene, Officer Stewart, Officer Listenbee, and a few other patrol officers were already present, and the emergency medical responders had just arrived. Officer Stewart informed Investigator Long that the emergency medical responders were inside working on the victim, who had been assaulted, shot, or stabbed. The female victim was distressed and reported to him that she had been smashed against a wall and struck in the head with a pistol. The female victim was not actively bleeding.

Sergeant Chris Chestnut led the crime scene investigation. When he arrived, he met with Investigator Long, who recounted the details of the crime scene and told him the deceased victim had been taken to the hospital. Sergeant Chestnut then went inside the residence with the female victim and a crime scene technician. The female victim claimed she had been struck in the side of the head, but due to her hair, he could not see whether she was bruised or bleeding. Inside the apartment, there were large amounts of blood on the couch and floor and blood spattered on the walls. As the female victim walked through the residence with him, she pointed out the items that had been disturbed.

The apartment had two bedrooms and both had been ransacked. The dresser drawers had been smashed and items were overturned. The female victim's purse was upside down on the bed in the master bedroom, and the contents of the purse had spilled. The mattresses in both bedrooms had been moved so that somebody could look under them. The female victim did not report any missing items, but she testified at trial that $90 had been stolen from her purse, along with a prescribed bottle of Xanax. [4]

Once the female victim calmed down, Investigator Long took her to the station and obtained a statement. The female victim described the defendant as a tall, thin, black male with dreadlocks and Mr. Booth as a shorter black male. The investigators began canvassing the surrounding neighborhood for information. Sergeant Chestnut also went to the hospital and met with Rita McCoy, the assistant medical examiner, and the victim's family. He and Ms. McCoy were careful to preserve the body for autopsy but did

---

[4] The female victim testified that she suffered a traumatic brain injury in a car accident and has also had two brain aneurysms. In the past, she had taken Xanax, Topamax, and Lithium for her brain conditions but had been released and, at the time of trial, only took medication as needed, including the Xanax prescribed for her "nerves."

visually inspect it. There were no visible gunshot wounds or stab marks. Investigator Long testified that there was a deep laceration on the deceased victim's forehead caused by some sort of blunt force. There was also some swelling to the deceased victim's eyes and a lot of blood.

The following day, Sergeant Chestnut and his officers continued casing the neighborhood. They also received several Crime Stoppers tips. One of the witnesses they spoke with in the neighborhood reported seeing a suspicious white vehicle in the area around the time the deceased victim's apartment was burglarized.

On June 12, 2014, Sergeant Chestnut received a report of a drive-by shooting. Approximately sixty gunshots had been fired into the home of Terron Kinnie. When Sergeant Chestnut and Investigator Long were leaving to respond, patrol officers were in pursuit of a white Chevrolet Malibu suspected to be associated with the shooting. When the vehicle finally came to a stop at a residence, the defendant got out of the driver's side and collapsed in the yard. The defendant was one of the victims shot while at Mr. Kinnie's house.

Sergeant Chestnut and Investigator Long were at the scene when the defendant exited the vehicle. They recognized that the white Chevrolet Malibu matched the description of the vehicle seen around the time of the deceased victim's murder. They also noticed that the man getting out of the vehicle matched the description of one of the suspects described by the female victim.

During the subsequent investigation into the shooting occurring June 12, 2014, Sergeant Chestnut and Investigator Long uncovered additional information that linked some of the people in Mr. Kinnie's residence at the time of the shooting to the deceased victim's death. After obtaining search warrants to retrieve the data from numerous cellular phones left at the scene of the shooting, Sergeant Chestnut and Investigator Long looked through text messages and photographs for evidence related to the shooting. When doing so, they found a text exchange about the deceased victim on a phone belonging to the defendant's girlfriend. In response to a text stating, "Did you hear about the murder of Rico Swift," the defendant's girlfriend said, "Yes, my boyfriend and his friends beat him to death." Sergeant Chestnut and Investigator Long also found several photos on Mr. Booth's phone of the defendant, Mr. Booth, Mr. Kinnie, and Mr. Norman together, including a photo taken in November of the preceding year in front of the apartment next door to the deceased victim's apartment and several photos of the men together the day after the deceased victim's murder.

Prior to the shooting, the Jackson Police Department prepared photo lineups of potential suspects, and the female victim had not been able to identify anyone. Following

the June 12, 2014 shooting, they prepared several additional lineups involving the people present in the house at the time of the shooting. From those lineups, the female victim identified the defendant and Mr. Booth. The female victim recognized Mr. Booth as the shorter man that entered the apartment first and recognized the defendant as the thinner, taller man with dreadlocks who entered the apartment behind Mr. Booth and later hit her with a gun. The defendant no longer had dreadlocks at trial, but the female victim was still able to identify him in the courtroom.

After being released from the hospital following the shooting, the defendant came to the police station for questioning by Sergeant Chestnut. Mr. Booth had already been questioned by investigators and had implicated the defendant. Sergeant Chestnut testified that prior to taking the defendant's statement, he told the defendant that Mr. Booth and the female victim had already reported his involvement in the deceased victim's murder. The defendant then gave a statement similar to the testimony he rendered at trial and identified the other men involved in the robbery and murder. At the conclusion of his statement, the defendant offered this apology, "I apologize for what happened to that man. I did not know it was going to happen like that. I was just following orders."

The details the defendant gave of the beating were consistent with the details given by the female victim and consistent with the victim's injuries. Though he claimed others were responsible for the injuries, the defendant knew the deceased victim had been grabbed in a headlock, beaten in the head, and that the female victim passed out. These were not details that had been released to the public.

The deceased victim's body was sent to Nashville for an autopsy. Dr. Miguel Laboy performed the autopsy and testified at trial that his external examination of the deceased victim revealed the following: a half by a quarter inch partial thickness laceration in his forehead; a half by quarter inch abrasion in the left forehead, slightly superior to the eyebrow; puffy and hemorrhagic eyelid; petechiae inside the lining of the eyelid; focal scleral hemorrhage in the superior left eye; multiple bruises on the chest, sides, and back; and redness on the back and right flank. Dr. Laboy's internal examination revealed contusions that involved areas of patchy hemorrhage on the muscles between ribs nine and ten and ten and eleven. Dr. Laboy found the cause of death to be blunt force injuries and asphyxia, and the manner of death to be homicide. Dr. Laboy testified that the laceration on the forehead could have been caused by a gun, but he could not tell the specific instrument used to cause the head laceration.

The State rested after calling Sergeant Chestnut, the female victim, Mr. Person, Officer Listenbee, Dr. Laboy, and Investigator Long to testify. The defense called Officer Stewart to confirm the female victim declined medical treatment. The defendant then testified and offered his version of the events. The State did not present any rebuttal

- 7 -

proof. The jury found the defendant guilty of two counts of first degree murder (Counts 1 and 2), two counts of aggravated robbery (Counts 3 and 4), one count of aggravated burglary (Count 5), one count of aggravated assault (Count 6), and one count of employing a firearm during the commission of a dangerous felony (Count 14).

During the second phase of the trial, the jury considered whether the defendant had prior felony convictions that would prevent him from possessing a firearm and enhance his sentence for employing a firearm during the commission of a dangerous felony. The jury also considered whether the underlying offenses were criminal gang offenses pursuant to Tennessee Code Annotated section 40-35-121 and subject to enhanced punishment. The State introduced a certified statement of Mr. Minor's prior felony conviction for residential burglary in Cook County, Illinois Circuit Court on May 30, 2012.

The State called Investigator Aubrey Richardson with the Jackson Police Department to testify. Investigator Richardson stated that she frequently participates in gang investigations and has investigated both the Vice Lords and the Black P-Stone Nation. Investigator Richardson first learned of the Black P-Stone Nation when she interviewed the defendant as part of the Jackson Police Department's investigation into the deceased victim's murder. According to Investigator Richardson, most street gangs fall under the People Nation or the Folk Nation. The defendant informed Investigator Richardson that both the Vice Lords and the Black P-Stone Nation fall under the People Nation, so the Black P-Stone Nation and the Vice Lords are affiliated across the country. There are not many members of the Black P-Stone Nation in the Jackson area, so due to the relationship between the Black P-Stone Nation and the Vice Lords, the defendant began to affiliate with the Vice Lords after moving to Jackson.

Investigator Richardson offered testimony regarding the defendant's tattoos. The defendant has a five-point star on his neck. The five-point star is known to represent the gangs within the People Nation, specifically the Vice Lords. The defendant has a pyramid tattooed on his forehead. This is common to members of street gangs falling under the People Nation. The defendant has another five-point star tattooed on his arm with the number five in it. This is also common to members of the Vice Lords and other gangs falling under the People Nation.

Investigator Richardson testified that the defendant associates with Kijuan Murphy, who was also interviewed as part of her investigation. On Mr. Murphy's Facebook page, she found a photograph of the defendant and four other men making gang signs. Investigator Richardson has also reviewed the photographs found on Mr. Booth's phone. One of the photographs showed the defendant, Mr. Booth, Mr. Kinnie, and Mr. Norman making a pyramid with their hands. Mr. Booth's phone also contained

other photographs of the men the defendant associates with making gang signs with their hands. Investigator Richardson stated that as part of her investigation in the deceased victim's death and other crimes, she learned the defendant, Mr. Booth, and Mr. Kinnie are all members of the Black P-Stone Nation, but because of the small number of them, they hung out with Vice-Lords, including Mr. Murphy and Mr. Thompson. The State introduced Mr. Murphy's criminal record into evidence, which showed felony convictions in Madison County Circuit Court for aggravated burglary and aggravated assault.

After calling Investigator Richardson as a witness, the State rested. The defendant did not call any witnesses. The jury found the defendant guilty of one count of convicted felon in possession of a firearm (Count 13), employing a firearm during the commission of a dangerous felony having been previously convicted of a felony (Count 14), and six counts of committing a criminal gang offense (Count 7 through Count 12). The trial court noted that the defendant's first degree murder convictions mandated a life sentence but declined to issue a formal sentence at that time and instead scheduled a sentencing hearing to be held November 16, 2015.

The transcript from the subsequent sentencing hearing is notably absent from the record provided to this Court. The judgments reflect an effective life sentence plus twenty years, broken down in the trial judge's capital case report as follows:[5]

| COUNT 1: | FIRST DEGREE MURDER | Counts 1 & 2 merge with Counts 7 & 8 Life with possibility of parole – 51 years |
| --- | --- | --- |
| COUNT 2: | FIRST DEGREE MURDER | |
| COUNT 3: | AGGRAVATED ROBBERY | Counts 3 & 4 merge with Counts 9 & 10 Enhancement – 20 years @ 85% |
| COUNT 4: | AGGRAVATED ROBBERY | |
| COUNT 5: | AGGRAVATED BURGLARY | Count 5 merges with Count 11 |

---

[5] While the trial court's capital case report does not list a sentence for each count, a judgment and a sentence were, in fact, entered for each conviction.

Enhancement – 10 years @ 30%

COUNT 6:  AGGRAVATED ASSAULT  Count 6 merges with Count 12
Enhancement – 10 years @ 30%

COUNT 7:  VIOLATION OF GANG ENHANCEMENT STATUTE
Counts 7 & 8 merge with Counts 1 & 2

COUNT 8:  VIOLATION OF GANG ENHANCEMENT STATUTE

COUNT 9:  VIOLATION OF GANG ENHANCEMENT STATUTE
Counts 9 & 10 merge with Counts 3 & 4

COUNT 10:  VIOLATION OF GANG ENHANCEMENT STATUTE

COUNT 11:  VIOLATION OF GANG ENHANCEMENT STATUTE
Merges with Count 5

COUNT 12:  VIOLATION OF GANG ENHANCEMENT STATUTE
Merges with Count 6

COUNT 13:  CONVICTED FELON IN POSSESSION OF A FIREARM,
Having been previously convicted of a felony, to wit:
Residential Burglary       Merges with Count 16

COUNT 14:  EMPLOYING A FIREARM DURING THE COMMISSION OF A DANGEROUS FELONY TO WIT: AGGRAVATED BURGLARY
Merges with Count 15
10 years @ 100%
To run consecutive to Count 5

COUNT 15:  EMPLOYING A FIREARM DURING THE COMMISSION OFA DANGEROUS FELONY TO WIT: AGGRAVATED

BURGLARY, HAVING BEEN PREVIOUSLY
CONVICTED OF RESIDENTIAL BURGLARY

> Merges with Count 14
> 10 years @ 100%
> To run consecutive to
> Count 5

COUNT 16: VIOLATION OF GANG ENHANCEMENT STATUTE

> Merges with Count 13
> 4 years @ 30%

The defendant subsequently filed a motion for a new trial and an amended motion for a new trial, in both only raising the insufficiency of the evidence to support his convictions. The trial court denied the motions on February 8, 2016. This timely appeal followed.

On appeal, the defendant argues the evidence presented at trial was insufficient to support his convictions, and his convictions for six counts of violating the Gang Enhancement Statute should be vacated because the statute has been found unconstitutional. The State argues the evidence was sufficient to sustain the defendant's convictions, and the defendant has waived his argument regarding the unconstitutionality of the Gang Enhancement Statute and is not entitled to plain error review. After a review of the record, submissions of the parties, and applicable law, we affirm the judgments of the trial court.

*Analysis*

## I. Sufficiency of Evidence

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans,* 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson,* 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas,* 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by

the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace,* 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State,* 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State,* 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown,* 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State,* 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes,* 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson,* 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell,* 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State,* 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes,* 331 S.W.3d at 379 (citing *State v. Rice,* 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

The defendant does not challenge the sufficiency of the evidence with respect to the specific offenses, so this Court does not individually address the defendant's convictions. The defendant instead argues the evidence was insufficient because the firearm used during the commission of the offenses was never recovered, he abandoned the robbery attempt by signaling "no" to his co-conspirators, and the female victim had

- 12 -

previously suffered from a traumatic brain injury, could not give a description of the gun she claims the defendant pointed in her face, did not seek medical treatment following the attack, and did not report any stolen items until she testified at trial. In effect, the defendant challenges the credibility of the female victim's testimony.

Our review of the record reveals that the female victim testified that the defendant was one of two men who initially came into the apartment under the guise of purchasing marijuana from the deceased victim. The female victim further testified that both men repeatedly beat the deceased victim in the head and choked him. Moreover, according to the female victim's testimony, after Mr. Booth threw her against the wall and dragged her to the kitchen, the defendant pointed a gun between her eyes and then knocked her in the head with the gun, rendering her unconscious. When she woke, only the deceased victim remained in the apartment, and he was hunched over the couch, bleeding profusely from the head.

The defendant offered testimony that corroborated much of the female victim's testimony. The core difference between the testimony of the female victim and the testimony of the defendant is that the defendant denied the presence of a gun and claimed his friends delivered the blows that injured the victims, while he merely canvassed the apartment and subsequently tried to stop the robbery, and ultimately the murder, from going forward. All questions concerning the credibility of witnesses are to be resolved by the trier of fact and not the appellate court. *See State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003). By finding the defendant guilty, the jury accredited the testimony of the female victim and discounted the testimony of the defendant, and this Court will not re-evaluate those findings on appeal. The evidence was sufficient to support the defendant's convictions. Therefore, the defendant is not entitled to relief on this basis.

## II.     Criminal Gang Offenses Enhancement Statute

The defendant further contends his convictions for violating Tennessee Code Annotated section 40-35-121, the criminal gang offenses enhancement statute, should be vacated because this Court has found the statute unconstitutional. The State argues the defendant waived this argument by failing to raise it during trial or in his motion for new trial, and the defendant is not entitled to plain error review because he failed to show a breach of a clear and unequivocal rule of law. We agree with the State.

Based on our review of the record, the defendant challenges the constitutionality of Tennessee Code Annotated section 40-35-121 for the first time on appeal, so the issue has been waived. *See State v. Hatcher,* 310 S.W.3d 788, 808 (Tenn. 2010); *State v.*

*Rhoden*, 739 S.W.2d 6, 10 (Tenn. Crim. App. 1987); *see also* Tenn. R. Crim. P. 16(b)(2). Moreover, the defendant is not entitled to "plain error" review. In discussing "plain error" review, the Tennessee Supreme Court has held:

> This Court will not grant relief under plain error review unless five criteria are met: (1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it probably changed the outcome of the trial. If any of these five criteria are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established. The party claiming plain error has the burden of persuading the appellate court.

*Hatcher,* 310 S.W.3d at 808 (citations and internal quotation marks omitted).

When enhancing the defendant's sentence pursuant to Tennessee Code Annotated section 40-35-121, the trial court did not breach a "clear and unequivocal rule of law." This Court did not find the gang enhancement statute to be unconstitutional until after the defendant's trial beginning September 22, 2015, and the imposition of his sentence on February 8, 2016. *See State v. Jermaine Stripling*, No. 2015-01554-CCA-R3-CD, 2016 WL 3462134 at *8 (Tenn. Crim. App. June 16, 2016) (holding Tennessee Code Annotated section 40-35-121(b) violates substantive due process principles); *State v. Devonte Bonds*, No. E2014-00495-CCA-R3-CD, 2016 WL 1403286, at *22 (Tenn. Crim. App. April 7, 2016) (holding Tennessee Code Annotated sections 40-35-121(b) and (e) are unconstitutional). "Every act of the General Assembly is presumptively constitutional until condemned by judicial pronouncement." *Taylor v. State*, 995 S.W.2d 78, 85n7 (Tenn. 1999). Because the criminal gang offenses enhancement statute was in full effect at the time of the defendant's convictions and sentencing, he is not entitled to "plain error" review. The defendant is not entitled to relief on this basis.

The dissent references *Teague v. Lane*, 489 U.S. 288 (1987) and *Meadows v. State*, 849 S.W.2d 748 (Tenn. 1993) *overruled by Bush v. State*, 428 S.W.3d 1 (Tenn. 2014). These cases reference the standard for applying a new state constitutional rule retroactively to claims for post-conviction relief and are inapplicable to the situation at hand. While we recognize the seemingly harsh impact of our ruling, due to the defendant's failure to preserve his constitutional challenge of the gang enhancement statute for appeal, there is simply no procedural mechanism on direct appeal for this Court to vacate his convictions for violating Tennessee Code Annotated section 40-35-

121. In the absence of plain error, the defendant must have preserved the issue for review by raising it before the trial court in a motion for new trial, and he failed to do so. *See State v. Gomez*, 163 S.W.3d 632, 648 (Tenn. 2005) *overruled on other grounds by State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007) (recognizing plenary review is only available in direct review "pipeline" cases when the issue has been preserved for review).

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE